William H. LOGAN, Plaintiff,

v.

Donna E. SHALALA, Secretary of the Department of Health and Human Services, Defendant.

No. 94–3226.

United States District Court, C.D. Illinois, Springfield Division.

March 30, 1995.

---

Donald J. Hanrahan, Lauren J. Pashayan, Land of Lincoln Legal Assistance Foundation Inc., Springfield, IL, for plaintiff.

James A. Lewis, U.S. Atty., Springfield, IL, for defendant.

### ORDER

EVANS, United States Magistrate Judge:

This cause is before the Court on Plaintiff's motion, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3), for review of a final decision rendered by the Secretary of Health and Human Services ("Secretary") finding him not disabled and consequently not entitled to supplemental security income. Plaintiff requests a reversal of the Secretary's decision or, in the alternative, a remand for another hearing. For the reasons stated hereafter, Plaintiff's motion is denied.

### STATEMENT OF THE CASE AND PRIOR PROCEEDINGS

Plaintiff applied for SSI on June 15, 1990, November 6, 1990, and February 26, 1992. Each application was denied initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). On January 13, 1994, a hearing was held in Springfield, Illinois. Plaintiff, represented by an attorney, testified along with a vocational expert. On February 19, 1994, the ALJ concluded that Plaintiff was not disabled and consequently, not entitled to supplemental security income. On June 20, 1994, the ALJ's decision became the final decision of the Secretary when the Appeals Council denied Plaintiff's request for review.

### LAW AND STANDARD OF REVIEW

In order to be entitled to disability insurance benefits, Plaintiff must show that his inability to work is medical in nature and that he is totally disabled. Disability bene-fits are meant only for "sick" persons and are not intended to be a surrogate unemployment insurance or a welfare program. Thus, economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether Plaintiff is eligible for disability benefits. See 20 C.F.R. § 404.1566.

Establishing disability under the Social Security Act is a two-step process. First, Plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death or which have lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (Supp. 1994); 20 C.F.R. § 416.905(a). Second, there must be a factual determination that the impairment renders the Plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir.1980). That factual determination is made using a five-step test. *See* 20 C.F.R. § 416.920. The steps are examined in order as follows:

1. Is the Plaintiff presently unemployed?
2. Is the Plaintiff's impairment "severe?"
3. Does the impairment meet or exceed one of a list of specified impairments?
4. Is the Plaintiff unable to perform his former occupation?
5. Is the Plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step, or on steps 3 and 5 to a finding that the Plaintiff is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the Plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605, 607 n. 2 (7th Cir.1984). Plaintiff has the burden of production and persuasion on steps 1–4. Once the Plaintiff shows inability to perform past work, however, the burden shifts to the Secretary to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250, 1253 (7th Cir.1985); *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir.1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's findings with the Court's own assessment of the evidence. *Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th Cir.1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen,* 782 F.2d 79, 82 (7th Cir.1986). In determining whether the ALJ's findings were supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Credibility determinations made by the ALJ will not be disturbed unless such findings are "patently wrong." *Luna v. Shalala,* 22 F.3d 687, 690 (7th Cir.1994).

## DISCUSSION AND ANALYSIS

Plaintiff was thirty-six years of age at the time of the ALJ's decision. He alleged disability due to drug and alcohol dependence and a fractured right ankle. In arriving at her conclusion that Plaintiff was not disabled for purposes of receiving supplemental security income, the ALJ determined, among other things, that Plaintiff was presently unemployed, his impairments did not meet or exceed one of the listed impairments, he had no prior relevant work experience, and there were a significant number of jobs in the national economy which he could perform.

Plaintiff offers two arguments in support of his motion. Although it is difficult to ascertain from Plaintiff's memorandum, it appears Plaintiff first attacks the ALJ's determination that his impairments did not meet or exceed one of the listed specified impairments (step 3 of the five-part test). Next, Plaintiff argues that the ALJ erred by relying on the vocational expert's testimony (step 5 of the five-part test). Plaintiff's arguments will be addressed in turn.

1. Plaintiff's argument involves step 3 of the five-step process utilized by the Secretary to determine if one is disabled. If Plaintiff did in fact

## I

Although it is difficult to determine since Plaintiff's memorandum is not entirely clear, it appears Plaintiff argues that the medical evidence supports the conclusion that he suffers from two of the listed impairments—specifically, an organic mental disorder (20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.02) and a personality disorder (Listing 12.08).[1] His argument is primarily based on the findings of Kenneth Imhoff ("Imhoff"), an examining psychologist. After examining Plaintiff, Imhoff diagnosed an organic mental disorder and a personality disorder which, if accepted by the ALJ, would entitle Plaintiff to supplemental security income. However, the ALJ decided against adopting Imhoff's conclusions. Consequently, the ALJ concluded that Plaintiff's impairments failed to meet or exceed any of the listed impairments.

### A. Organic Mental Disorder (Listing 12.02)

An organic mental disorder is a psychological or behavioral abnormality associated with a dysfunction of the brain. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.02. Generally, "history and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." *Id.* In order to establish the presence of such an impairment, the claimant must satisfy several requirements. Pursuant to part B of Listing 12.02, the claimant's condition must result in two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like set-

suffer from a listed impairment, he would of course be entitled to supplemental security income.

tings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.02B.[2] If the claimant's condition fails to meet two of the four criteria of part B, he is presumptively not disabled for the purposes of Listing 12.02.

According to Imhoff's mental capacity evaluation, Plaintiff's condition failed to meet either criterion one or two of part B.[3] (Transcript pg. 345). Thus, Plaintiff's condition must meet both criterion three and four in order to be presumptively disabling under Listing 12.02 (assuming part A is also satisfied).

Regarding criterion four, the mental capacity evaluation form submitted to Imhoff (apparently drafted by Plaintiff's attorney) asked for an "estimate" of the episodes of deterioration or decompensation. (Transcript pg. 346). In response, Imhoff circled the words "marked" and "extreme." (Transcript pg. 346). However, the ALJ disregarded Imhoff's conclusion. We agree with the ALJ's reasoning discrediting Imhoff's evaluation.

First, when determining if a claimant's condition meets criterion four, the medical examiner is *not* asked to provide an *estimate* of future episodes (or for that matter an *estimate* of past episodes), rather, the examiner is required to support his conclusion with specific instances of "deterioration or decompensation." Once the specific instances are identified, the claimant does not meet criterion four unless such instances can be characterized as "repeated episodes."[4] Thus, by providing an estimate instead of specific episodes of deterioration or decompensation, Imhoff's conclusion is misleading and potentially inaccurate.

The evaluation form was defective in another respect. Imhoff was directed (apparently by Plaintiff's attorney) to analyze Plaintiff's condition regarding criterion four by circling the word "none," "slight," "moderate," "marked," or "extreme." Yet, as evidenced by 20 C.F.R. § 404.1520a(b)(3), when rating a claimant's degree of functional limitation under criterion four the ALJ is required to employ a scale utilizing the terms "never," "once or twice," "repeated," and "continual." Thus, Imhoff's report did not even utilize the proper terminology.

█ Consequently, since Imhoff failed to identify specific episodes of deterioration or decompensation, but instead apparently provided an estimate (utilizing improper terminology) of future episodes, we agree with the ALJ finding his conclusion unreliable and misleading. Plaintiff, citing *Washington v. Shalala*, 37 F.3d 1437, 1441 (10th Cir.1994), argues that Imhoff's conclusion nevertheless constitutes as substantial evidence under criterion four. We concede that *Washington* appears to support Plaintiff's position. However, based on our research, in *every* case that we could locate (with of course the exception of *Washington*) discussing criterion four, the respective discussion concerned specific, identifiable episodes of deterioration or decompensation. *See, e.g., Young v. Secretary of Health and Human Services*, 957 F.2d 386, 391 (7th Cir.1992) (Acknowledging that "Council held that [the claimant] did not suffer deterioration ... because there were no documented instances of deterioration-related episodes reported in the record."); *Weikert v. Sullivan*, 977 F.2d 1249, 1253 (8th Cir.1992) (Acknowledging that "the ALJ found that [the claimant] had experienced episodes of deterioration or decompensation in work or work-like settings once or twice, which is not considered disabling under the listings."); *Lankford v. Sullivan*, 942 F.2d 301, 307 (6th Cir.1991); *Burnicks v. Shalala,*

---

2. The claimant is first required to demonstrate one of seven criteria listed in part A. However, since the disputed issue pertains to the ALJ's conclusion regarding the criteria of part B, there is no need to discuss part A.

3. Imhoff concluded that Plaintiff did not have a "marked" restriction or difficulty in criterion one or two, respectively. Instead, he concluded

Plaintiff's condition resulted in a "slight to moderate" restriction and difficulty regarding the respective criterion. (Transcript pg. 345).

4. Three or more instances of deterioration or decompensation qualify as "repeated episodes." *See* 20 C.F.R. § 404.1520a(b)(3).

No. 93–C–4722, 1994 WL 87323, U.S.Dist. LEXIS 3085 (N.D.Ill. March 16, 1994) ("The ALJ's findings regarding deterioration and decompensation are supported by substantial evidence" since the claimant "failed to show that she repeatedly had episodes of deterioration or decompensation prior to the March 13, 1992 onset date."); *Young v. Sullivan*, No. 1 91–C–7703, 1992 WL 212588, U.S.Dist. LEXIS 13074 (N.D.Ill. August 27, 1992) ("[T]he ALJ disagreed with the doctors' evaluation because there was no evidence presented of episodes of work related stress and resulting deterioration. . . ."). With the exception of *Washington*, we are not aware of a single case that supports Plaintiff's position.

The Court acknowledges Plaintiff's problem regarding criterion four. That is, due to Plaintiff's sparse employment history,[5] it would be difficult to identify repeated episodes of deterioration or decompensation in work or work-like settings. *See Figueroa-Rodriguez v. Secretary of Health and Human Services*, 845 F.2d 370, 373–74 (1st Cir. 1988). In other words, due to limited experience in work-like settings or environments, criterion four arguably penalizes individuals like Plaintiff by requiring "repeated episodes" of deterioration or decompensation. Nevertheless, there is no indication that criterion four was intended to be interpreted as broadly as Plaintiff suggests.[6]

■ Thus, since the plain language of criterion four implicitly requires identifiable episodes of deterioration or decompensation

and virtually every case that we could locate discusses or analyzes criterion four by referring to specific episodes of deterioration or decompensation, we decline to interpret criterion four as broadly and expansively as Plaintiff suggests. Consequently, since Plaintiff bases his claim for relief entirely on Imhoff's report and Imhoff's conclusion regarding criterion four is invalid, Plaintiff has failed to satisfy his burden that he suffers from a listed impairment.[7] Thus, Plaintiff is presumptively not disabled. And, since there were several medical examiners who concluded that Plaintiff did not suffer from a mental impairment, the ALJ's decision finding Plaintiff not disabled is supported by substantial evidence.

Since Plaintiff has failed to satisfy his burden regarding part B of Listing 12.02, our discussion regarding Plaintiff's argument that he suffers from an organic mental disorder could end right here. However, we would like to comment on several other issues raised by Plaintiff. The following discussion assumes that Imhoff's evaluation was not defective, *i.e.*, that Imhoff validly diagnosed an organic mental disorder.

■ In concluding that Plaintiff did not suffer from an organic mental disorder the ALJ notably relied on the opinions of other medical examiners. For instance, Dr. Terry Brelje, a psychologist, after asking Plaintiff a series of questions and administering a standardized intelligence test (the WAIS–R), stated that "no mental illness was observed."

---

5. Plaintiff's employment history consists of a few months of janitorial-type work for Maintenance Supply Corporation (Transcript pg. 53–54), a week at the Mermaid Car Wash (Transcript pg. 54), and six months of part-time janitorial-type work for SEDA (Transcript pg. 54). Arguably, the only incident of deterioration or decompensation in the record is Plaintiff's termination from Maintenance Supply Corporation due to alcoholism. (Transcript pg. 65). However, there is no indication that his termination was the result of deterioration or decompensation in conjunction with his alcoholism. Regardless, one incident of deterioration or decompensation is not enough to satisfy the criterion four standard of "repeated episodes."

6. Also, it is important to stress that criterion four refers to "work or work-like settings." Thus, although Plaintiff has limited work experience,

he can meet criterion four by identifying deterioration or decompensation in "work-like" settings or environments. Thus, by referring to "work-like" settings, arguably, criterion four does not penalize people like Plaintiff who have a rather meager employment history.

7. As noted above, in order for his condition to be classified as an organic mental disorder, Plaintiff is required to prove that such condition meets two of the four criteria of part B. Even Imhoff concluded that Plaintiff's condition did not meet criterion one or two. And, based on our analysis, we agree with the ALJ finding Imhoff's conclusion regarding criterion four misleading and unreliable. Thus, at best, Plaintiff can only meet one of the four criteria listed in part B. Because Plaintiff can only meet one of part B's criteria, he is presumptively not disabled for purposes of receiving supplemental security income.

(Transcript pg. 294). Dr. Brelje ultimately concluded that Plaintiff had "an ongoing problem with alcohol abuse." (Transcript pg. 295). Similarly, Dr. Obul Reddy, a psychiatrist, after administering a "mental status examination," concluded that Plaintiff had a "significant history of alcohol and drug abuse dependence and addiction" but did not otherwise have "any other identifiable psychiatric problem." (Transcript pg. 291). Plaintiff was also examined by Gorden H. Ford, a licensed clinical psychologist. Following Plaintiff's evaluation, Ford opined that his results were "consistent with the previous psychiatric and psychological evaluations" finding "a long-term abuse of both alcohol and drugs, borderline cognitive intellectual ability with little evidence of significant short-term or long-term memory difficulties, and an absence of significant personality or emotional disturbance." (Transcript pg. 298). Finally, the ALJ noted that Plaintiff's long-term treating physician, Lowell Brown, never referred him to a mental health professional to treat any mental problem (other than alcohol and drug abuse) and also never diagnosed Plaintiff with a mental disorder. In fact, Dr. Brown marked Plaintiff's "capacity for sustained mental activities" as a "mild limitation." (Transcript pg. 321).

■ Based on the opinions of the various medical examiners discussed in the preceding paragraph (which of course conflict with Imhoff's opinion), it appears that there is substantial evidence supporting the ALJ's decision that Plaintiff is not disabled. *See Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.1987) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)."). Plaintiff, however, essentially argues that Imhoff's opinion should be accorded greater consideration because he was the only examiner to conduct a "battery of psychological tests." In fact, Plaintiff claims that the ALJ's opinion is not supported by substantial evidence since the other medical examiners never specifically tested for the impairments at issue. Finally, Plaintiff claims that since no other medical examiners conducted a "battery of psychological tests," Imhoff's conclusions were uncon-

tradicted, thus, the ALJ, in concluding that Plaintiff did not suffer from a listed impairment, substituted her own judgment for that of a relevant professional. *See Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir.1992) ("The Secretary's decision must be based on testimony and medical evidence in the record, and the Secretary cannot make his own independent medical determination about the claimant.").

Essentially, Plaintiff asks the Court to hold that when a medical examiner performs a "battery of psychological tests" that medical examiner's conclusion is, as a matter of law, superior to the conclusions of other examiners who failed to administer such tests. Or, in other words, a medical examiner's failure to administer a "battery of psychological tests" indicates (as a matter of law) that the medical examiner's conclusion regarding the patient's mental or psychological well-being is unsubstantiated, or at the very least, inferior to an examiner who administered such tests.

In response to Plaintiff's argument, we first note that Dr. Brelje did in fact perform a standardized test (the WAIS–R). Furthermore, every examiner, with the exception of Plaintiff's treating physician, administered some form of oral examination whereby they asked Plaintiff questions and based their individual diagnosis on Plaintiff's responses (Dr. Reddy referred to the test as a "mental status examination"). In response, Plaintiff would most likely argue that the tests performed by Imhoff are more thorough and complete, thus, they are more accurate indicators of psychological impairments than the "simple" tests performed by the other examiners.

Perhaps Plaintiff is correct. However, the problem with Plaintiff's contention is that the Court is not qualified or competent to support that conclusion. That is, the Court is obviously not educated or trained in the medical field, thus, we certainly cannot conclude that Imhoff's opinion is superior to the other examiners' opinions merely because he performed additional tests. As far as we know, an examiner's opinion regarding one's psychological well-being based on that examin-

er's observation of the patient and his analysis of responses to certain questions is just as accurate as an examiner who performs a "battery of psychological tests." [8] Plaintiff fails to cite any medical or legal authority in support of his contention, nor could the Court locate any such authority.[9] And, as noted above, Plaintiff has the burden of proving that he suffers from one of the listed impairments. Thus, we conclude that the ALJ's conclusion is supported by substantial evidence, namely the opinions of the other examiners who unanimously concluded that Plaintiff did not suffer from any psychological impairments.

Furthermore, the ALJ discredited Imhoff's report for numerous reasons, according it low probative value. Plaintiff objects to many of the reasons articulated by the ALJ in discrediting the report. Based on our analysis, we cannot conclude that the ALJ improperly rejected Imhoff's report.

First, the ALJ noted that Imhoff, aware of the opinions of other examining psychiatrists and psychologists finding no evidence of mental impairments, diagnosed an organic mental disorder, yet he failed to perform additional tests which would apparently *confirm* the presence of such a disorder.[10] If Imhoff diagnosed Plaintiff with an organic mental disorder, why did he neglect to perform additional tests which would *confirm* such a conclusion (especially considering no

other examiners could find evidence of a mental impairment)?

Second, Imhoff concluded that Plaintiff was functioning at a rate of 44 to 49 on the Global Assessment of Functioning Scale. Such a functioning rate is associated with "serious symptoms of a mental impairment, such as suicide ideation, severe obsessional rituals, frequent shop-lifting, and a serious impairment in social, occupational or school functioning, such as the total lack of friends, or the inability to keep a job." (Transcript pg. 27). The ALJ concluded that Plaintiff's testimony at the hearing directly contradicted Imhoff's findings. We agree.

No other medical examiner concluded that Plaintiff suffered from anything other than alcohol and drug abuse/dependence. There is no evidence in the record indicative or analogous to suicide ideation, severe obsessional rituals, or frequent shop-lifting. Regarding Imhoff's report finding a serious impairment in social functioning, Plaintiff testified that he visits friends once or twice a week (friends who do not use drugs or alcohol) (Transcript pg. 61 and 71), that he attends Alcoholics Anonymous meetings twice a week (Transcript pg. 61), that he has been recently attending church every Sunday (Transcript pg. 71), and that he performs some housework and prepares simple meals (Transcript pg. 61). True, Plaintiff has difficulty in maintaining employment, but by his

---

**8.** Furthermore, as noted above, Dr. Brelje did in fact administer a standard intelligence test and Dr. Reddy conducted what he termed a "mental status examination." Additionally, all examiners (except for Plaintiff's long-term treating physician) asked several questions and based their respective opinion regarding Plaintiff's mental well-being on the responses to those questions. Are these tests sufficient to indicate the presence of a mental impairment? Are more tests required? We do not know. However, apparently the individual examiners were satisfied with the results (concluding that no mental or psychological impairment was present) such that no further testing was required.

**9.** According to Listing 12.02, an organic mental disorder is discovered through "history and physical examination *or* laboratory tests." (emphasis added). There is no indication that an examiner must administer numerous tests. Moreover, 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00D, states that "[t]he results of well-

standardized psychological tests ... *may* be useful in establishing the existence of a mental disorder." (emphasis added). Listing 12.00D does not · require the use of such tests. However, Listing 12.00D also states that "[i]n cases involving impaired intellectual functioning, a standardized intelligence test, e.g., the WAIS, *should* be administered and interpreted by a psychologist or psychiatrist...." (emphasis added). As noted above, Dr. Brelje administered the WAIS–R and concluded that Plaintiff did not suffer from a mental disorder.

**10.** In the ALJ's decision, she states that the Luria–Nebraska and Halstead–Reitan tests would *"confirm* the existence of an organic brain disorder." We could not locate any medical or legal authority supporting or challenging that conclusion. However, since Plaintiff does *not* challenge the ALJ's statement, apparently he concedes that such tests would confirm the existence of the disorder at issue.

own admission this is apparently due to his alcohol problem (Transcript pg. 54 and 65).

Third, Imhoff diagnosed Plaintiff with a personality disorder. However, as discussed below, Imhoff's mental capacity evaluation is inconsistent with such a diagnosis. Thus, we conclude that there is substantial evidence supporting the ALJ's decision discrediting Imhoff's report.

## B. Personality Disorders (Listing 12.08)

■ Plaintiff also apparently argues that he suffers from a personality disorder. In support of his argument, he relies entirely upon Imhoff's report. However, as noted above, Imhoff's report fails to satisfy the Listing 12.08 criteria necessary for finding a presumptively disabling personality disorder. That is, according to Listing 12.08B, the required level of severity for a personality disorder is met when, among other things, *three* of the following result:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistent or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.08B.[11] Yet, interestingly, Imhoff's report analyzing Plaintiff's degree of functional restriction concludes that Plaintiff does *not* have a "marked restriction" or "marked difficulty" regarding criterion 1 and 2, respectively. Instead, Imhoff characterizes Plaintiff's functional restrictions under both criterion as "slight to moderate." (Transcript pg. 345). Thus, according to Imhoff's report, Plaintiff's condition does *not* result in a finding of three of the four criteria listed in 12.08B. Consequently, for the purposes of

receiving supplemental security income, Plaintiff does *not* presumptively suffer from a personality disorder based on Imhoff's report.

Thus, since Imhoff's report concedes that Plaintiff is not presumptively disabled under Listing 12.08 and no other medical examiner found evidence of a personality disorder, Plaintiff has failed to meet his burden establishing a listed medical impairment. Moreover, since no other examiner concluded that Plaintiff suffered from a mental or personality disorder, the ALJ's decision is supported by substantial evidence.

### II

■ Next, Plaintiff argues that the ALJ erred by relying on the vocational expert's testimony because such testimony failed to consider all of Plaintiff's functional limitations. This argument involves step 5 of the five-part test. Since Plaintiff has no past relevant work experience, the Secretary has the burden at step 5 to establish that he can engage in some type of substantial gainful employment.

In determining whether Plaintiff could perform a significant number of jobs in the national economy, the ALJ employed the services of a vocational expert. The ALJ asked the vocational expert a hypothetical question and directed the expert to determine, after considering the limitations posed by the question, what types of jobs such an individual could perform. (Transcript pg. 73–74). Plaintiff argues that the hypothetical question failed to accurately reflect his limitations and capabilities, thus, the ALJ's determination that he could perform a significant number of jobs in the national economy was not supported by substantial evidence.

First, Plaintiff argues that the hypothetical question did not reflect the limitations as stated by Imhoff. However, as discussed throughout this order, Imhoff's report was validly discredited by the ALJ for numerous reasons.

Next, Plaintiff argues that, regardless of Imhoff's report, the hypothetical question as-

---

**11.** Plaintiff must also satisfy part A of Listing 12.08.

sumed that Plaintiff was functioning at an educational level equivalent to a high school graduate, yet the record supports the conclusion that his educational level is much lower. Thus, argues Plaintiff, the jobs identified by the vocational expert are not appropriate for an individual with Plaintiff's developmental limitations. Specifically, Plaintiff, citing the *Dictionary of Occupational Titles* (DOT), argues that the jobs identified by the vocational expert are inappropriate for an individual with his level of reasoning, mathematical, and language development. We disagree.

Plaintiff's argument is initially premised on the conclusion that the vocational expert was unaware of his borderline intellectual functioning level. That is, because the ALJ's hypothetical question referred to an individual with a high school education, Plaintiff assumes the vocational expert's response was also based on an individual with that level of education. However, the vocational expert was well aware of the fact that, although Plaintiff obtained a high school diploma, he was not functioning at a level generally associated with a high school education. Indeed, the vocational expert was aware of Plaintiff's intelligence quotient (IQ) scores (evidencing borderline intelligence functioning, but not quite in the mentally retarded range) and he even adopted Imhoff's report finding that Plaintiff read and performed arithmetic at a fourth grade level. (Transcript pg. 77). With this information in mind, the vocational expert identified several jobs in the national economy that Plaintiff could perform. Thus, although the hypothetical question referred to an individual with a high school education, the vocational expert was well aware of Plaintiff's intellectual limitations.

■ Next, Plaintiff argues that the vocational expert's description of the identified jobs was contrary to the DOT's characterization. Related to that argument, Plaintiff further contends that the DOT requires greater levels of reasoning, mathematical, and language skills than Plaintiff possesses. The above arguments are premised on the conclusion that the DOT's general educational de-

velopment requirements (*i.e.,* reasoning, mathematical, and language skills) are binding on the ALJ. However, the DOT's requirements are not controlling and they are to be applied in light of the vocational expert's professional knowledge regarding one's ability to perform an identified job. *See Conn v. Secretary of Health and Human Services,* 51 F.3d 607 (6th Cir.1995) ("[T]he ALJ may rely on the testimony of the vocational expert even if it is inconsistent with the job descriptions set forth in the Dictionary."); *Basinger v. Secretary of Health and Human Services,* No. 94–3004, 1994 WL 421726, U.S.App. LEXIS 21795 (6th Cir. Aug. 11, 1994) ("The social security regulations do not require the Secretary or the vocational expert to rely on DOT classifications."); *Barker v. Shalala,* 40 F.3d 789, 795 (6th Cir.1994) ("It would be manifestly inappropriate to make the [DOT] the sole source of evidence concerning gainful employment."); *Jackson v. Sullivan,* No. 92–C–4089, U.S.Dist. LEXIS 10903 (N.D.Ill. Aug. 3, 1993) ("We do not read [the regulations] as requiring an ALJ to follow DOT classifications in spite of contrary testimony from a vocational expert.").

Here, as noted above, the vocational expert was well aware of Plaintiff's intellectual deficiencies. (Transcript pg. 77). Although he was unaware of the general educational development requirements pertaining to each individual identified job, the vocational expert stated that such jobs could be performed by an individual operating at a fourth grade level. (Transcript pg. 77). In fact, the vocational expert further stated that the identified jobs could even be performed satisfactorily by individuals "who are classified as mentally retarded."[12] (Transcript pg. 77). Thus, regardless of the DOT requirements, the vocational expert's professional knowledge supported his conclusion that Plaintiff could perform the identified jobs. Consequently, since the ALJ relied on the vocational expert's testimony, her conclusion that Plaintiff could perform significant jobs in the

12. No examiner, including Imhoff, found Plaintiff to be functioning at a level within the mentally retarded range. Rather, every examiner clas-

sified Plaintiff's mental skills as "below average" or "borderline range of intellectual functioning."

national economy was supported by substantial evidence.[13]

### III

*Ergo,* Plaintiff's motion for summary judgment (d/e 8) is DENIED. The Secretary's motion for summary affirmance (d/e 10) is ALLOWED.

---

13. Plaintiff does not attack any additional conclusions reached by the ALJ regarding his ability to perform the jobs at issue. For example, the ALJ concluded that Plaintiff could perform simple, unskilled work. Plaintiff does not challenge that conclusion. Rather, Plaintiff argues that the jobs at issue require more skills than he exhibits.